In the

# United States Court of Appeals
### For the Seventh Circuit

No. 01-4067

INTERNATIONAL TRUCK AND ENGINE CORP.,

*Plaintiff-Appellant,*

v.

UNITED STEEL WORKERS OF AMERICA, LOCAL 3740,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01 C 31—**John W. Reynolds**, *Judge.*

ARGUED MAY 22, 2002—DECIDED JUNE 21, 2002

Before POSNER, KANNE, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff, a company that manufactures steel castings, fired one of its foundry workers for refusing to submit to a drug test. The defendant union took the matter to arbitration, pursuant to its collective bargaining agreement with the company, and won. The company brought suit under section 301 of the Taft-Hartley Act, 29 U.S.C. § 185, to set aside the arbitrator's award; lost; and appeals, arguing that the arbitrator, rather than interpreting the agreement, in effect rewrote it; but conceding as it must that as long as the arbitrator was interpreting the

parties' contract rather than basing decision "on some body of thought, or feeling, or policy, or law that is outside the contract," *Ethyl Corp. v. United Steelworkers of America*, 768 F.2d 180, 184-85 (7th Cir. 1985), the award must stand even if the arbitrator's interpretation was actually a misinterpretation. E.g., *Eastern Associated Coal Corp. v. United Mine Workers of America, District 17*, 531 U.S. 57, 62 (2000). Only if "there is no possible interpretive route to the award, so [that] a noncontractual basis can be inferred," may the award be set aside. *Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1506 (7th Cir. 1991).

The collective bargaining agreement states that "where the Company has reasonable cause to believe that an employee is under the influence of drugs . . . the employee will be required to submit to a test of his/her urine and/or blood . . . . Refusal by an employee to consent to a test for the presence of drugs . . . or to otherwise fully cooperate in an investigation involving drugs pursuant to this policy will constitute insubordination and result in immediate termination." After receiving anonymous phone calls accusing an employee named Cox of trafficking in illegal drugs, and observing him at meetings in which he appeared to be under the influence of drugs, the company's director of human resources, Vandermale, decided there was reasonable cause to require Cox to take a blood or urine test for drugs. But to make assurance doubly sure he had the outside of Cox's car, and the area of the foundry in which Cox (though others as well) worked, swept by a machine that detects drugs by contact with any surface that contains drug residue. This "environmental" test detected cocaine in both places swept, whereupon Vandermale asked Cox to submit to a blood or urine test plus an environmental test of the outside of his clothing. Upon his refusing, the company fired him for failing to cooperate in an investigation involving drugs.

The arbitrator interpreted the passage we quoted from the collective bargaining agreement to permit the company to require an employee to take a urine or blood test for drugs only if there is reasonable cause to believe him under the influence of drugs *at the very moment* he is asked to take it; and the company concedes that it had no reason to believe Cox under the influence of drugs at the moment Vandermale asked him to submit to the tests. The arbitrator's interpretation of the collective bargaining agreement is narrow, literalistic, and quite possibly wrong, especially when one considers how dangerous foundry work is and how dangerous therefore a foundry worker high on cocaine is to himself and his fellow workers. A blood or urine test based on reasonable cause to believe that a worker is an intermittent user of cocaine though not necessarily under its influence at the instant he was asked to take the test—no one is under the influence of drugs *all* the time—would be a reasonable safety measure, since it would detect recent use, indicating a nontrivial probability that the worker is sometimes high at work.

But the fact that the arbitrator chose to interpret the parties' agreement literally (more precisely, adopted the narrowest possible literal meaning, for it would have done no violence to the text to interpret "is under the influence" as denoting intermittent use over a longer period than the instant at which the worker is asked to take the test), ignoring contextual factors that pointed to the wisdom of a somewhat broader interpretation, hardly shows that he was not *really* interpreting the agreement but instead was off on a frolic of his own, disregarding the contract in favor of his own views of labor relations or workplace safety. Of this there is no indication in his long and careful opinion.

The company indulges in paradox in attacking the opinion as *too* literal; we are cited to no cases in which an attack

based on such a ground has succeeded. For while literal interpretations are often wrong (as we noted recently in *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 859-61 (7th Cir. 2002)), they are wrong because the interpreter understood the task of interpretation set him by the parties too narrowly. That mistake (which would be no mistake if the parties wanted him to stick to the words of the document to be interpreted) is at the opposite end of the error spectrum from the mistake of interpreting a document so broadly that the intentions of the parties and the manifestation of those intentions in the written word are set aside in favor of the arbitrator's own idea of how the parties should have arranged their affairs. Taken far enough, loose interpretation can be as unhinged from the parties' intentions and expression as the interpretation of a dream can be from the dream's true meaning (if there is such a thing)—so unhinged as to show that really there is no possible interpretive route from the document purportedly interpreted to the conclusion reached. But, to repeat, if the arbitrator made a mistake in this case it was in sticking too close to the actual language of the contract, not in casting it aside.

It is not as if the collective bargaining agreement had contained a rule of interpretation requiring loose interpretation—had, for example, instructed the arbitrator to "interpret the company's drug policy broadly in light of the safety concerns that actuated it," as in such cases as *Schacht v. Beacon Ins. Co.*, 742 F.2d 386, 388 (7th Cir. 1984) ("the arbitrators . . . shall make their award with a view to effecting the general purpose of this Agreement rather than in accordance with the literal interpretation of the language"); see also *Pacific Reinsurance Management Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1025 (9th Cir. 1991); *Eagle Star Ins. Co. v. Yuval Ins. Co.*, [1978] 1 Lloyd's Rep. 357, 362 (Ct. App. 1977). An arbitrator who discarded an interpretive rule laid down in the collective bargaining agreement might

be guilty of usurpation, but that is not our case. No inter-pretive rule was prescribed and so the arbitrator was free to choose an interpretive rule, *Richmond, Fredericksburg & Potomac R.R. v. Transportation Communications Int'l Union*, 973 F.2d 276, 279 (4th Cir. 1992)—and so to opt for literal-ism, among the various recognized interpretive strategies, if he wanted to.

Whereas commercial arbitrators frequently choose lit-eralism, Lisa Bernstein, "Private Commercial Law in the Cotton Industry: Creating Cooperation Through Rules, Norms, and Institutions," 99 *Mich. L. Rev.* 1724, 1735 (2001); Bernstein, "Merchant Law in a Merchant Court: Rethinking the Code's Search for Immanent Business Norms," 144 *U. Pa. L. Rev.* 1765, 1769-70 (1996), labor arbitrators generally prefer loose interpretation. See, e.g., *Tice v. American Airlines, Inc.*, 288 F.3d 313, 317 (7th Cir. 2002); *International Ass'n of Machinists & Aerospace Workers, Progressive Lodge No. 1000 v. General Electric Co.*, 865 F.2d 902, 906 (7th Cir. 1989); *SFIC Properties, Inc. v. International Ass'n of Machinists & Aerospace Workers, District Lodge 94*, 103 F.3d 923, 925 (9th Cir. 1996). And this is a labor arbitration case. But we do not under-stand the company to be arguing that labor arbitrators are required by the understanding the parties bring to labor arbitration to foreswear literalism. *Southern California Gas Co. v. Utility Workers Union of America, Local 132*, 265 F.3d 787, 793-94 (9th Cir. 2001), illustrates judicial reluctance, in a case much like this, to set aside a labor arbitrator's award merely because the arbitrator stuck close to the literal terms of the collective bargaining agreement.

In the district court and again in this court, the company argues that the arbitrator's really serious mistake was in overlooking its argument that Cox's refusal to submit to a nonintrusive environmental search of his clothing was a failure to cooperate in the investigation of his drug use and that the failure provided cause for his termination. The

arbitrator did not mention the argument and we are reasonably certain that it was not made to him. The company claims to have made it in its brief to the arbitrator, but the union vociferously denies this and the company failed to make the brief a part of the record either in the district court or in this court and so has disarmed itself from rebutting the finding of waiver on the basis of what the brief contained. So far as we can determine, the only issue before the arbitrator was whether the company had reasonable cause to believe that Cox was under the influence of cocaine, an issue the arbitrator resolved against the company by his narrow but permissible interpretation of "is under the influence." That refusing to submit to the environmental test of his clothing violated Cox's duty of cooperation was hardly an argument that the arbitrator was likely to tumble to on his own. Not only or mainly because it was not the arbitrator's business to repair the company's forensic omission, and because the collective bargaining agreement contains no reference to environmental tests, and because the test in question is not obviously less intrusive than testing a urine sample. But also and more important because the company hadn't offered Cox the option of taking just the environmental test. It had insisted that he take a blood or urine test as well, which, under the arbitrator's interpretation, he was entitled to refuse to do without being punished for his refusal.

AFFIRMED.

A true Copy:

  Teste:

      _____
      *Clerk of the United States Court of*
      *Appeals for the Seventh Circuit*